UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MYLES RAMSEY v. CITY OF SANTA ANA, ET AL. | CASE NO. 8:21-cv-00825-JLS-KES<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 51)** |

Before the Court is a Motion for Summary Judgment filed by Defendants the City of Santa Ana, Peter Beaumarchais, Jeremy Reguerin, Ronald Sandoval, Christopher Shynn, and David Thai.  (Mot., Doc. 51.)  Plaintiff opposed, and Defendants replied. (Opp., Doc. 53; Reply, Doc. 59.)  Having considered the parties' submissions and heard oral argument, the Court now DENIES the Motion.

## I.     BACKGROUND

This action concerns the use of force during a traffic stop initiated by Santa Ana Police Department ("SAPD") Detectives Jeremy Reguerin and Peter Beaumarchais on May 2, 2019 around 5:20 in the evening.  (Plaintiff's Statement of Genuine Disputes ("SGD"), Doc. 54 ¶¶ 3-7.)  Defendants assert that Beaumarchais and Reguerin observed Plaintiff Myles Ramsey, driving a black Toyota Camry, make a turn without signaling and drive at a high rate of speed after turning.  (*Id.* ¶ 4.)  The registration tags on the Camry's license plate were expired, though Ramsey asserts that he had paid his registration fees. (Ramsey Depo., Doc. 51-4 at 19.)  According to Reguerin, he learned the tags were expired while conducting a records check after initiating the traffic stop.  (Reguerin Decl., Doc. 51-7 ¶ 7.)

The detectives, who were following the Camry, assert that Ramsey turned again without signaling onto Halladay Street.  (SGD ¶ 6.)  Beaumarchais states that the detectives initiated the stop as soon as they turned on to Halladay Street by activating their lights and then both their lights and siren on their patrol car; Ramsey states that they pulled him over by briefly activating the siren once, and that they never had the lights on. (Beaumarchais Decl., Doc. 51-5 ¶ 6; Ramsey Decl., Doc. 53-2 ¶ 5.)  Both parties agree that Ramsey pulled to a stop in the driveway of a residence on Halladay Street.  (SGD ¶ 10.) The residence was Ramsey's.  (Opp. at 6.)

Ramsey states that, at the time, his car door handle was broken, so he warned the officers that he would have to climb out of the window and told them he was exiting

2

before climbing out of the window of the car. (Ramsey Decl. ¶ 6.) Defendants assert that the detectives ordered Ramsey to stay in the car, but he did not comply. (Statement of Undisputed Facts ("SUF"), Doc. 51-1 ¶ 16.) The Court has reviewed the detectives' body camera footage of the incident, and it is not clear that they ordered him to stay in the car before he had exited it; he appears to be mostly out of the vehicle when the order is given by both detectives. (*See* Beaumarchais Footage, Doc. 51-6; Reguerin Footage, Doc. 51-8.)

Given the parties' divergent characterizations of the interaction, and the availability of video footage of some of the incident, the Court finds it most helpful to summarize what can be seen clearly from the video, and to supplement with the parties' other evidence. Both detectives exit their vehicle with their guns drawn and pointed in Ramsey's direction. Beaumarchais states "What are you doing bro? Put your hands up on the car, man." (Beaumarchais Footage 00:34.) Ramsey turns and places his hands on the hood of the Camry. (*Id.* 00:37.) Beaumarchais orders "Spread your feet," and Ramsey turns with both arms raised and hands open, saying "For what?" (*Id.* 00:40.) Beaumarchais says, "I fucking told you to." (*Id.* 00:43.) Ramsey says, "I don't give a fuck, I didn't do shit." (00:45.) Ramsey turns back around and is facing the car, and Beaumarchais comes up behind him and places his hands on Ramsey's back. (*Id.* 00:48.) As this is happening, Reguerin approaches, training his gun at Ramsey. (Reguerin Footage 00:30-00:44.) From Reguerin's body camera footage, it can be seen that Beaumarchais is behind Ramsey, as Ramsey faces the car and has his hands on the hood of the car.

Beaumarchais states that during this interaction he observed that Ramsey has a condition known as "cauliflower ear" on his right ear, which is, according to Beaumarchais, "common in individuals who engage in martial arts, wrestling, and/or boxing." (Beaumarchais Decl. ¶ 9.) Ramsey states that he does not have such a condition. (Ramsey Decl. ¶ 24.) In Defendants' body camera video footage and in photos of Ramsey taken on the date of the incident, no such condition is visible, although there is no side-view photo of Ramsey's right ear. (*See* Ex. 3B to Tiomkin Decl, Doc. 53-3 at 9.)

3

Beaumarchais asserts that as he was standing behind Ramsey he "felt [Ramsey's] body tense and he turned, pulling his left arm away from me." (Beaumarchais Decl. ¶ 10.) This cannot be seen on either Beaumarchais or Reguerin's body camera video. Ramsey states that he did not take his hands off of the roof of the car and "was not threatening or aggressive in any way." (Ramsey Depo. at 22-23; Ramsey Decl. ¶ 9.) Beaumarchais throws his arm around Ramsey's neck, attempting to place him in a carotid restraint hold (commonly known as a "chokehold"). (Reguerin Footage 00:45; Beaumarchais Decl. ¶ 13.) At this point, both Beaumarchais and Ramsey fall to the ground, with Beaumarchais falling on his back and Ramsey falling forward on top of him. (*Id.* 00:48.) It is not clear from the video how it happened. Ramsey states that Beaumarchais threw him to the ground. (Ramsey Decl. ¶ 10.) Beaumarchais states that when Beaumarchais attempted to apply the carotid restraint hold, Ramsey "reacted like a trained fighter and defended against the hold" and "shook [Beaumarchais] off his back causing us to fall to the ground. As we fell to the ground, I was able to control both of his arms and wrapped my legs around his waist." (Beaumarchais Decl. ¶¶ 11-12.) Reguerin simply says "Beaumarchais contacted Ramsey and a struggle ensued," and "[d]uring the struggle, Detective Beaumarchais and Ramsey fell to the ground." (Reguerin Decl. ¶ 11.)

At this time, neither detective's video is clear – both officers' body cameras were dislodged and fell to the ground during the interaction. (SGD ¶ 28.) According to Reguerin, he tried to pull Ramsey off of Beaumarchais by the hips, got behind Ramsey, and tried to apply a carotid restraint hold. (Reguerin Decl. ¶ 12-13.) Ramsey asserts that when he fell on top of Beaumarchais he "didn't want to be … on top of him" because he did not want "anybody thinking [he was] trying to assault an officer," and tried to work himself to his knees. (Ramsey Depo. at 24-25.) Reguerin states that "Ramsey was able to stand up with me on his back and shake me off." (Reguerin Decl. ¶ 14.) Beaumarchais states "Ramsey was able to overpower both Officer Reguerin and myself as he stood up to

4

his feet with Officer Reguerin on his back and my legs wrapped around his waist." (Beaumarchais Decl. ¶ 13.)

At some point during the foregoing, Beaumarchais's radio lapel microphone was keyed, broadcasting the sounds of the incident over the police radio. (SGD ¶ 28.) Detectives Ronald Sandoval, David Thai, Christopher Shynn, and Carlos Luevano responded to the scene. (*Id.* ¶ 29.) From Sandoval's body camera video footage, when he arrives on the scene, Beaumarchais is on the ground, with Ramsey bent over him, and Reguerin stands over Ramsey and has his arms around Ramsey's neck. (Sandoval Footage, Doc. 51-10 at 00:29.) From the ground, Beaumarchais is holding at least one of Ramsey's wrists and has his legs hooked around Ramsey's waist. (*Id.*) Thai, Sandoval, and Shynn all appear to arrive at the scene almost simultaneously. (*See* Sandoval Footage; Thai Footage, Doc. 51-12; Shynn Footage, Doc. 51-14.) Sandoval comes up behind Ramsey and applies a carotid restraint, falling backwards with Ramsey on top of him. (Sandoval Footage 00:30; SGD ¶ 33.) Thai holds onto Ramsey's left wrist as Sandoval applies the carotid restraint. (SGD ¶ 34.) Sandoval was unable to complete the carotid hold, *i.e.* cause Ramsey to lose consciousness.

Shynn comes behind Sandoval and Ramsey and takes over applying a carotid restraint on Ramsey, saying "I'll get it." (Shynn Footage 00:46.) Voices – presumably the other detectives – can be heard saying "not yet, not yet," "keep going," and "all right, he's out." (Sandoval Footage 00:40-1:10.) At this point, Shynn lets go of Ramsey. (*Id.*)

The detectives handcuffed Ramsey, who was unconscious, then placed him on his side. (SGD ¶ 40.) Ramsey was taken to the hospital. (Ramsey Decl. ¶ 15.) He was cited for resisting a peace officer, expired registration, and failure to signal at a turn, and was never criminally prosecuted. (SGD ¶¶ 50-51.)

Ramsey filed the instant action on May 3, 2021. (Doc. 1.) He brings two claims: (1) violation of civil rights under 42 U.S.C. § 1983 against Beaumarchais, Reguerin, Sandoval, Shynn, and Thai; and (2) a *Monell* claim under 42 U.S.C. § 1983 against the

City of Santa Ana.  (First Amended Complaint, Doc. 19 ¶¶ 8-28.)  Defendants now move for summary judgment on both claims.

## II. LEGAL STANDARD

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-moving party's favor, and a fact is "material" when it might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248.  But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried.  The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'"  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

### III. DISCUSSION

Defendants argue that (1) summary judgment is warranted as to Ramsey's excessive force claim because the undisputed facts demonstrate that the force used against Ramsey was objectively reasonable; (2) the officers are shielded from liability by qualified immunity; (3) summary judgment is warranted as to Ramsey's *Monell* claim; and (4) there is insufficient evidence to support Ramsey's claim for punitive damages.

#### A. Excessive Force

The Fourth Amendment guarantees the right to be free from unreasonable seizures. U.S. Const. amend. IV. Excessive force claims brought "in the context of an arrest or investigatory stop of a free citizen," invoke the protections of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Deciding these claims requires an analysis of the objective reasonableness of the use of force, balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotations omitted). This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "'Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom ... summary judgment or judgment as a matter of law ... should be granted sparingly' in cases involving claims of excessive force." *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003)) (alterations in original). The Ninth Circuit has recently found that "for purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022).

With regards to the intrusion on Ramsey's Fourth Amendment rights, there is no doubt that it was serious. There are two main types of uses of force at issue in this case: Beaumarchais and Reguerin pointing their guns at Ramsey in the initial traffic stop, and the use, or attempted use, of a carotid restraint on Ramsey by Beaumarchais, then Reguerin, then Sandoval, then Shynn. "[P]ointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010). As to carotid restraints, "[a] carotid hold can constitute significant or even deadly force." *Brown v. Grinder*, No. 13-01007, 2019 WL 280296, at *9 (E.D. Cal. Jan. 22, 2019); *see also Rascon v. Brookins*, No. 14-00749, 2018 WL 783675, at *10 (D. Ariz. Feb. 8, 2018) ("[T]he use of the carotid hold may constitute a significant use of force and threatens serious injury when applied multiple times"); *Ayala v. City of S.F.*, No. 06-02061, 2007 WL 2070236, at *7-8 (N.D. Cal. July 13, 2007) (finding that a reasonable jury could conclude that the use of carotid restraint was use of deadly force). The use of carotid restraints by law enforcement is currently prohibited under California law. *See* Cal. Gov. Code § 7286.5 ("A law enforcement agency shall not authorize the use of a carotid restraint or choke hold by any peace officer employed by that agency."). These intrusions on Ramsey's rights must be balanced against the government's interests.

The Court here finds that conducting this intensely fact-specific balancing at summary judgment is inappropriate in this case. As should be no surprise from the above recounting of the facts, there are a number of material factual disputes. Here, while the video captures much of the incident, the Court does not find that the video "blatantly" contradicts the testimonial evidence put forth by the parties. At summary judgment, the Court cannot make the credibility determinations needed to choose between the parties' conflicting accounts; rather, it views all of the evidence in the light most favorable to Ramsey, the non-moving party, and draws all justifiable inferences in his favor. What is more, "because questions of reasonableness are not well-suited to precise legal

determination, the propriety of a particular use of force is generally an issue for the jury." *Cameron v. Craig*, 713 F.3d 1012, 1021 (9th Cir. 2013) (quotations omitted).

As to the initial stop by Beaumarchais and Reguerin, Defendants concede that the stop was for "minor traffic violations" but argue that Ramsey's "conduct raised serious red flags," including that he: pulled into a driveway rather than over on the side of the street; he climbed out of the driver's side window of the car; he disobeyed orders to stay in the car; he turned around to argue with Beaumarchais when ordered to put his hands on the car and spread his feet; he was six feet tall and weighed approximately 185 pounds; he had "cauliflower ear"; and he was "visibly agitated." (Mot. at 10-11.) As above, nearly all of these facts are in dispute. Ramsey asserts that he warned the officers before exiting through the window, that he was not ordered to stay in the car until he was already almost fully out of it, and that he does not have cauliflower ear. It can be seen from the video that when ordered to put his hands on the roof of the car, Ramsey initially turned towards the car, then turned around and asked "For what?", then turned back around and placed his hands on the car. *See Nelson v. City of Davis,* 685 F.3d 867, 881 (9th Cir. 2012) ("[W]e have recognized that a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"). Given the factual disputes and the video evidence, there is certainly an issue for the jury as to whether any of this conduct (and non-conduct, as Ramsey's size and alleged "cauliflower ear" are merely descriptive of his person) rendered the detectives' choice to point their guns at Ramsey reasonable, and how these circumstances factored into the reasonableness of what came next.

Defendants then argue that Beaumarchais's use, or attempted use, of a carotid hold on Ramsey was objectively reasonable because, when Beaumarchais tried to put Ramsey in handcuffs, Ramsey "pulled away from" Beaumarchais. (Mot. at 11.) "Plaintiff, whose conduct suggested a possible flight risk, had gone from being uncooperative, to verbally combative, to physically resistant," Defendants argue. (*Id.*) However, whether Ramsey

9

was resistant to Beaumarchais's efforts to put him in handcuffs too is a disputed question of fact. Ramsey asserts that he did not resist or remove his hands from the roof of the car, and the Court accepts Ramsey's version of events as true at summary judgment, as it is not contradicted by the video. Moreover, "[r]esistance, or the reasonable perception of resistance, does not entitle police officers to use *any* amount of force to restrain a suspect." *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013). Even if Ramsey is found to have "continually turned his head left and right and moved a hand from the top of the car," (SUF ¶ 21) as Defendants allege, there remains a question as to whether a carotid restraint was a reasonable amount of force to use in response to effect an arrest. As to Reguerin's use of the carotid restraint, a reasonable jury could find from the evidence that Reguerin saw Beaumarchais use an improper carotid restraint and then pull Ramsey to the ground. Under those circumstances, a jury could find Reguerin's use of the carotid restraint unconstitutional.

      The events concerning Sandoval, Thai, and Shynn are less in dispute. These three detectives arrived to see Reguerin applying, or attempting to apply, a carotid restraint hold on Ramsey as Beaumarchais held onto him from the ground. Sandoval applied, or attempted to apply, a carotid restraint. Shynn applied a carotid restraint, choking Ramsey to unconsciousness. All parties agree Thai's only use of force was assisting Sandoval in using a carotid restraint by holding Ramsey's left wrist while Sandoval was applying or attempting to apply the carotid restraint. Defendants argue that "[a]s late-arriving officers, Detectives Sandoval and Thai were neither in a position, nor required, to second-guess the other officers in that moment." (Mot. at 12.) Even allowing that the late-arriving officers were entitled to assume that Beaumarchais and Reguerin were attempting to effect a lawful arrest and that Reguerin's use of a carotid restraint was reasonable, a question for the jury remains as to whether, once the officers outnumbered Ramsey five-to-one, the use of a carotid restraint remained a reasonable use of force. *See Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) (considering that "the officers outnumbered the plaintiff"

in making determination as to whether use of force was reasonable). The jury will need to weigh the same factors outlined above to determine the reasonableness of the late-arriving detectives' conduct, "judg[ing] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," or with knowledge of what preceded their arrival on the scene. *Graham*, 490 U.S. at 396.

Accordingly, Defendants' motion is DENIED as to Ramsey's excessive force claim.

### B. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In order for a right to be "clearly established," it is not necessary that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court has recognized that the specificity of the right is particularly important in certain contexts, such as in Fourth Amendment cases, where officers must confront situations where it is unclear how the relevant legal doctrines apply. See *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). However, "general statements of the law are not inherently incapable of giving fair and clear warning" to government officials. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotations omitted). General rules may provide sufficient guidance in "obvious case[s]." See *Kisela*, 138 S. Ct. at 1153. Courts must be mindful of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quotations omitted); *see also Hyde v. City of Wilcox*, 23 F.4th 863, 872-73 (9th Cir. 2022) ("[W]e are generally loath to second-guess law enforcement officers' actions in a dangerous situation by analyzing each act without looking at the entire event and considering the officers' mindset

11

amid the uncertainty and chaos. We should not scrutinize an officer's every minor move in a frantic and chaotic situation as if we were examining the Zapruder film in slow-motion.").

Here, Defendants argue that no clearly established law prohibited their use of the carotid restraint on Ramsey. (Mot. at 15.) Both parties agree that it is clearly established law in the Ninth Circuit that the use of a carotid restraint on a non-resisting person violates the Fourth Amendment. *See Tuuamelemalo v. Greene*, 946 F.3d 471, 477-78 (9th Cir. 2019) (noting the "robust consensus among the circuits that the use of a chokehold on a non-resisting person violates the Fourth Amendment" and denying qualified immunity to officers to officers who used chokehold on non-resisting, restrained subject in 2014); *see also Barnard*, 721 F.3d at 1076 (denying qualified immunity to officers who used chokehold on non-resisting plaintiff in 2001).

The Court finds the facts of *Barnard* particularly instructive.  In that case, officers executing an arrest warrant for David Barnard, came to the plaintiff, Charles Barnard's, house, where David was staying. *Barnard*, 721 F.3d at 1071.  Charles, who answered the door to the officers, complied with the officers' order to "put his 'fucking hands on the wall.'" *Id.* at 1072.  Then,

> Standing behind Charles, Officer Theobald seized Charles's right arm and handcuffed his right wrist. Before Theobald could handcuff Charles's other arm, however, Theobald tripped on a flower pot that was on the Barnards' landing. Theobald fell backward, still holding onto the handcuffs that were attached to Charles's right wrist. Officer Radmanovich, who had been standing to Charles's left, grabbed for Charles's left (free) arm as Charles was being pulled down by Theobald, but Radmanovich tripped over one of Charles's legs, and all three men came crashing down; Radmanovich on top of Charles, and Charles on top of Theobald.
> Officer Clark then joined the fracas. Clark came over to Charles, who was still lying on top of Theobald, and put Charles in a chokehold.

*Id.* The facts of the present case, viewed in the light most favorable to Ramsey, are similar to *Barnard* in several important respects. Ramsey asserts that he had his hands on the roof of the car and did not resist Beaumarchais. While he does not allege that Beaumarchais tripped, he asserts that Beaumarchais pulled him down. Like the plaintiff in *Barnard*, Ramsey fell on top of the detective. It was at that point that Reguerin came over and placed Ramsey in a carotid restraint. The Court finds these facts sufficiently similar to place Defendants on notice that – if events transpired as Ramsey states that they did – the use of a carotid restraint violated Ramsey's Fourth Amendment rights.

As above, the undisputed facts do not establish that Ramsey was resisting when Beaumarchais used the carotid restraint on him, so "[a]t this stage of the proceedings, we must assume that [Ramsey] was not resisting when [Beaumarchais] used a chokehold on him." *Tuuamelemalo*, 946 F.3d at 478. Viewing the facts in the light most favorable to Ramsey, he had both hands on his car and was not resisting, and Reguerin's gun was pointed at him, when Beaumarchais first applied a carotid restraint. Ninth Circuit law clearly establishes that this is a Fourth Amendment violation. Factual issues also preclude qualified immunity as to Reguerin's use of a carotid restraint for similar reasons. Ramsey has put forth evidence that Beaumarchais pulled him to the ground, and that he was not in fact resisting. The video does not blatantly contradict this evidence.

The Court also notes that Defendants invoke qualified immunity only as to the use of carotid holds; the Motion does not address the issue of Beaumarchais and Reguerin detaining Ramsey at gunpoint. Qualified immunity is accordingly denied as to both individual defendants for the use of force involved in pointing their guns at Ramsey.

As to Sandoval, Thai, and Shynn, Defendants argue that "qualified immunity protects their conduct as late-arriving officers." (Mot. at 16.) In *White*, the Supreme Court explained that "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as officer identification, have already been followed. No settled

13

Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers in instances like the one [the officer] confronted here." *White*, 580 U.S. at 80.  In that case, the Supreme Court concluded that qualified immunity protected a late-arriving officer who used deadly force against an armed man where two earlier-arriving officers had not properly identified themselves as law enforcement.  *Id.*

      Thus, Sandoval, Thai, and Shynn were entitled to assume that Beaumarchais and Reguerin had followed proper procedures up to that point and were making a lawful arrest.  This leaves the question of whether, when the three late-arriving officers came on the scene, Ramsey was resisting and unrestrained.  No matter what late-arriving officials reasonably assume about what has transpired beforehand, they have an independent duty to comply with the Fourth Amendment.  As explained previously, it is not clear from the video that Ramsey was resisting.  (*See* Sandoval Footage; Thai Footage; Shynn Footage.)  In the Thai Footage, it can be seen that Thai is holding one of Ramsey's wrists, and another detective is holding the other arm.  (Thai Footage 00:39-00:46.)  Ramsey's arms appear flexed, and he seems to be pushing against the detectives' holds.  However, Ramsey asserts that he "felt like [he] was suffocating to death" and his body was "jerking while [he was] just trying to catch a breath."  (Ramsey Decl. ¶ 12); *see United States v. Koon*, 34 F.3d 1416, 1450 (9th Cir. 1994) (rejecting argument that force used on suspect after he writhed in response to being stomped on by an officer was reasonable, explaining "[i]t is simply disingenuous to say that an involuntary movement in response to a stomp poses the same threat as a voluntary movement made in an attempt to resist arrest"), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996).  At this stage, the Court must view the facts in the light most favorable to Ramsey and accepts that Ramsey was not resisting.

      Moreover, the Ninth Circuit has held that a person need not be in full body restraints or even handcuffs to be considered restrained.  *See Tuuamalemalo*, 946 F.3d at 477 ("there was little chance he could initiate resistance with five other officers fully

14

restraining him and pinning him to the ground"); *see also Hunter v. City of Federal Way*, 806 F. App'x 518, 520 (9th Cir. 2020) (finding that plaintiff was restrained and rejecting qualified immunity for chokehold use on plaintiff by officer who "pushed [plaintiff] against his car and put [plaintiff]'s arms behind his back before applying the chokehold"). Thus, there also remains the question of whether Ramsey was restrained when he was being held down by four other officers as Sandoval and then Shynn applied carotid restraints.

In short, there are factual questions as to whether Ramsey was resisting and whether he was restrained when Sandoval, Thai, and Shynn arrived that preclude a finding of qualified immunity at this stage.

Accordingly, Defendants' motion is DENIED as to qualified immunity.

### C. *Monell* Claim

A municipality is liable under 42 U.S.C. § 1983, "only where the municipality itself causes the constitutional violation at issue" via the "'execution of the [its] policy or custom[.]'" *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (discussing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *Canton*, 489 U.S. at 389-91.). There are three routes a plaintiff may pursue in attributing allegedly tortious actions to municipal policy: (1) "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the plaintiff may establish that the individual who committed the constitutional tort was an official with

final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (collecting cases) (internal quotations omitted).

Defendants argue that summary judgment is appropriate as to Ramsey's *Monell* claim. (Mot. at 17-21.)  They argue that "there does not exist, nor did there exist at the time of the incident, a custom, practice or policy of permitting the use of excessive force against suspects." (*Id.* at 19.)  Defendants appear to have inadvertently failed to supply the Court with a copy of their written policy regarding use of force in effect in May 2019. (*See* Valentin Decl., Doc. 51-15 ¶ 11 (referencing an Exhibit A that is not attached to the declaration).)  On this basis alone, the Court could deny summary judgment, as it is Defendants' burden to point to record evidence showing a lack of genuine disputes of material fact.  Nevertheless, the Court considers the policy description offered by the Santa Ana Chief of Police David Valentin in his declaration:

> In 2019, the SAPD authorized officers to use the carotid control hold if they had completed the SAPD's required training on the technique and under two circumstances (1) when a subject is violent or physically resisting or (2) when the subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

(*Id.* ¶ 14.)

A policy need not be "per se unconstitutional" in order to cause a constitutional violation for a *Monell* claim. *Jackson v. Gates*, 735 F.2d 648, 654 (9th Cir. 1992).  For example, in *Chew v. Gates*, a departmental policy that authorized seizure of all concealed suspects by dogs trained to bite hard and hold, whether the suspects were resistant or unresistant, armed or unarmed, violent or nonviolent, was sufficient to preclude summary judgment on a *Monell* claim. 27 F.3d 1432, 1444 (9th Cir. 1994).  Given this policy, the

Ninth Circuit explained, "[t]here [was] little doubt that a trier of fact could find that [plaintiff]'s injury was caused by city policy," where the plaintiff was bitten by a police dog while fleeing the police after a traffic stop.  *Id.*  Similarly, here a jury could find that SAPD's policy, which, according to Valentin, allows the use of a chokehold if a subject's "words … demonstrate[] an intention to be violent" and the subject "reasonably appears to have the potential to harm officers," authorizes the use of unconstitutional excessive force.  They could further find that SAPD's policy was the moving force behind the detectives' decisions to use the carotid restraints on Ramsey.  And, as above, a jury could find excessive force.  Defendants have not therefore shown an absence of a genuine dispute of material fact as to Ramsey's *Monell* claim.

### D. Punitive Damages

"Punitive damages are recoverable in an action under 42 U.S.C. § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"  *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1212 (E.D. Cal. 2011).  There is sufficient evidence in the record to create a factual dispute as to whether Defendants were reckless or callously indifferent to Ramsey's rights.  Defendants' Motion is DENIED as to punitive damages.

### IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED.

DATED:  March 17, 2023

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE